**In re George David YOUNG, Francine Young, Debtors.**

**Frederick L. RANSIER, Trustee, Plaintiff,**

v.

**COMPTON PLAZA, et al., Defendants.**

**Bankruptcy No. 2–88–03682.**
**Adv. P. No. 2–89–0148.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Sept. 21, 1990.

---

Frederick L. Ransier, Columbus, Ohio, plaintiff and Chapter 7 Trustee.

Jerry Weiner, Columbus, Ohio, for plaintiff.

Bradley Hummel, and Robert C. Perrin, Columbus, Ohio, for defendants.

## ORDER ON MOTION FOR DIRECTED VERDICT

DONALD E. CALHOUN, Jr., Bankruptcy Judge.

This cause came on for trial on September 11 and 12, 1990, upon the Second Amended Complaint filed by Frederick Ransier, Trustee in the Chapter 7 case of David and Francine Young. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this district. By previous Order of this Court, this has been determined a non-core proceeding under 28 U.S.C. § 157; however, the parties consented to entry of final judgment by this Court pursuant to 28 U.S.C. § 157(c). In this Opinion, the Court will refer to Frederick Ransier as "the Plaintiff" or "the Trustee"; the Second Amended Complaint shall be referred to as "the Complaint". David and Francine Young shall be collectively referred to as "the Debtors"; the singular term "Debtor" shall mean David Young. Donald and Anna Compton shall be collectively referred to as "the Defendants", and Compton Plaza, Inc. shall be referred to as "CPI". The singular term "Defendant" will denote Donald Compton.

Upon conclusion of the Plaintiff's case, the Defendants moved for directed verdict asserting that the evidence presented by the Plaintiff, together with matters previously deemed admitted, are insufficient to support entry of judgment in the Plaintiff's favor. The Plaintiff's Complaint articulates two claims, both grounded in fraud allegedly committed by the Defendants. In considering a Motion for Directed Verdict, the Court must construe facts in a light most favorable to the Plaintiff. For purposes of this Motion only, and construing the evidence in a light most favorable to

the Plaintiff, the Court finds and concludes as follows:

The Debtor, George David Young, Jr., is a real estate broker and developer, and has been involved in the real estate field for approximately 20 years. The Defendant, Donald Compton, is owner of a corporation known as Compton Roofing. In the summer or fall of 1985, the Debtor discovered that a parcel of real property located at Michigan and First Avenue in Columbus, Ohio was for sale. The property consisted of approximately 2.38 acres. The Debtor learned that Dresser Industries owned the property, and after some time, the Debtor and Dresser entered into negotiations to purchase the property. Eventually Dresser and the Debtor reached an agreement for terms of sale and set a sale price of $142,000.00. Debtor did not enter into a contract to purchase the property, but obtained from Dresser a non-exclusive right to purchase or sell the premises at this price, for which Debtor would also be paid a 4% realtor's commission. The Court views this as equivalent to an open, non-exclusive listing. The Debtor then put the real estate into the multiple listing system, and placed a sign on the property indicating it was for sale or lease. The Debtor's intention, however, was to elicit proposals for development of the property in which he would be a principal through a partnership, corporation or other business association. In order to promote the development objective, he had a survey done and retained an architect to commence preliminary drawings to show the possibilities of the site. The survey was completed on or about December 18, 1985. The first drawings were completed approximately April 14, 1986. Debtor's witness, Richard S. Guy, characterized the plans at this stage as "a footprint of a building" ... "not building construction plans". *See* Plaintiff's Exhibit 41–42.[1] The Debtor then be-

gan the search for a financial partner with papers which the Court characterize as a Pro Forma.

The Debtor met with several potential investors, but did not meet with any success until Donald Compton contacted him. The Defendant apparently saw the "For Sale" sign on the property and contacted the Debtor in November or December of 1986. They met a few times to review and discuss the Debtor's plans for development. Believing that they had similar concepts and goals, they ultimately reached an agreement to form a corporation for the purchase and development of the property. The record is clear that Debtor told his prospective investors that he needed a partner because he could not handle this deal himself. There is a dispute whether the Debtor concealed the severity of his financial condition from the Defendants during this time; however, subsequent events render this factual issue of little significance. In February 1987, the parties retained counsel to prepare and file Articles of Incorporation for CPI. Plaintiff's Exhibit 1 reflects that the Articles were in fact submitted to the Secretary of State on February 18, 1987; thus, CPI was formed. Apparently, election of directors and officers, issuance of stock, and initial corporate meetings may not have taken place until approximately June 1, 1987, although the documents bear March dates.[2]

The parties then approached Bank One, with whom the Defendant had had a banking relationship for 25 years, to finance purchase of the property for $142,200.00. The Bank agreed to loan $152,000.00, in order to purchase the land; to pay the closing costs and to reimburse the Debtor for expenses he paid relative to the survey and drawings. In connection with their application to the Bank, the parties obtained an appraisal of the property showing a value of $165,000 in its existing state, and

1. Similar characterization of the plans were made by witnesses Goodman and McClellan. Witness Axline characterized Plaintiff's Exhibit 41–42 as plans for foundation permits.

2. The parties expended a great deal of time on the date that these events took place as well as the true ownership of stock issued to Francine

Young. However, the parties failed to discuss the impact, if any, of these factors in this litigation. The Court is unable to find that these issues have any impact at this point since Bank One accepted the Corporation's existence for the first phase closing, being the real estate loan.

a value of $1.4 million if developed per the Debtor's marketing proposal. *See*, Defendant's Exhibit C, Plaintiff's Exhibit 23. As an inducement to make the land loan, the Defendants and Debtors agreed to execute a personal guaranty. *See* Defendants' Exhibit I. In addition to the mortgage on the property, the Defendants hypothecated certain assets as additional collateral for the loan. The loan documents were executed and the purchase closed on March 18, 1987. *See* Plaintiff's Exhibit 49; Defendant's Exhibits F and J. At closing, various disbursements were made, including approximately $6700.00 to the Debtor for reimbursement of expenses, and $5688.00 to the Debtor for a real estate commission. Also, the Defendant was reimbursed $9882.00 of the $10,000.00 down payment on the land that he had made earlier. The parties' plan for development was the basis of the Bank's interest in the deal and the Bank fully expected to follow this loan with a construction loan in the amount of $1.2 million dollars. This loan would pay the land loan, fund construction and fund an interest reserve during construction.

During this time period, the Debtor was experiencing further financial difficulties, which may or may not have been disclosed to the Defendants. The Court is convinced, however, that he did not fully reveal these financial difficulties to the Bank, in light of the assurances required by the Bank in the form of a personal guaranty and financial statements. This is further highlighted by various representations made in the documents, and the Bank's reaction to subsequent events.

Prior to meeting the Debtor, the Defendant had had a long-standing relationship with Richard Helland, of Capital City Products. In fact, the Defendant had approached Mr. Helland with a proposal or solicitation regarding development of certain other real estate owned by the Defendants. When the Debtors and Defendants commenced their business association, they approached Mr. Helland with a new proposal for development of the subject real estate. Since the Michigan and First Avenue property was immediately adjacent to the offices of Capital City Products, it was believed Capital City should have a particular interest in this property. Mr. Helland stated that when they offered to customize a building "for our purposes, we became interested." Their negotiations culminated in a verbal agreement for CPI to develop the property for use by Capital City Products, contingent upon an architectural design acceptable to Capital City and lease terms satisfactory to Capital City. At the request of the Debtor, this verbal agreement was subsequently memorialized in a letter authored by Helland dated July 20, 1987. *See* Plaintiff's Exhibit 31.

Sometime between March and June, differences developed between the parties, although it is unclear precisely when and why the difficulties arose. The Debtors' precarious financial condition deteriorated to the point that they filed a Petition for Relief under Chapter 13 of the Bankruptcy Code on June 25, 1987. This occasioned default under the land loan, and the Bank was unwilling to proceed to close the construction loan under the original terms and conditions, which had included the Debtor's participation.

When the Bank declined to proceed with the construction loan, the Debtor and Defendant began to scramble to protect their respective interests; one effort involved negotiating to purchase each other's stock. Of course, the Defendant also expected the Debtor to satisfy the existing Bank debt if he were bought out because of the Defendant's pledge of securities to the Bank to secure the loan. Although they traded offers, neither accepted the other's proposal. By this time, the Bank loan had matured on June 30, 1987, *see* Plaintiff's Exhibit 49, and the Bank was agitating for payment. In accordance with O.R.C. § 1701.58, the Defendants removed Debtors as directors of CPI on August 30, 1987. *See* Plaintiff's Exhibit 25. On August 31, 1987, the Defendants issued additional stock to themselves. *See* Plaintiff's Exhibit 35. Then on September 29, 1987, because of the default status of the loan, the Defendants paid the Bank and took an assignment of the Promissory Note, Mortgage and Personal Guaranty. *See* Defendant's Exhibit G. Also on

September 29, 1990, CPI, through the Defendants, agreed to transfer the property to the Defendants in full satisfaction of all indebtedness owed by the Corporation to the Defendants. *See* Defendant's Exhibits 33 and 36.

This transaction precipitated a suit by Debtors in the Common Pleas Court of Franklin County, Ohio, Case No. 87CV-106368. This action specifically involving the property at Michigan and First Avenues took that property out of the flow of commerce. Under the doctrine of *lis pendens*, this property was not acceptable to be pledged as security for loan purposes. The Defendants, in order to preserve and pursue the prospective project with Capital City Products, financed that development without using the subject property as collateral; rather, they used their other financial resources.[3]

Ultimately, the Defendants developed the property. Previous contacts with Capital City came to fruition and the Defendants began construction on the property in 1989. During the pendency of the building phase, Capital City (or its successor-in-interest) negotiated a contract and purchased a portion of the land and the unfinished building. Pursuant to the agreement, Capital City paid the Defendants $54,000 for the land, reimbursed the Defendants the costs of construction and interest expense incurred in connection with the construction loans, and paid the Defendants a fee of $125,000. The building was completed at a total cost of approximately $1,252,000.00. *See* Plaintiff's Exhibit 48. The construction and the transaction between Capital City and the Defendants was not completed until May 22, 1990. *See* Plaintiff's Exhibit 46. It took the Defendants approximately two years of time and effort to consummate the plans for development. Undoubtedly, the completed building is of a nature and configuration which allows further development on the remaining real estate compatible with the existing construction.

The Plaintiff's Complaint seeks a judgment directing the Defendants to account and pay CPI for properties misappropriated, profits obtained by virtue of the transaction and damages suffered by virtue of the transactions; the Complaint further requests that the transfer be held fraudulent and avoided pursuant to O.R.C. § 1701.76. The Plaintiff also seeks punitive damages by virtue of the actions of the Defendants. The demand for judgment is based upon two claims: First, that the actions of the Defendants resulted in default of the land loan, which impaired the interests of all stockholders; and second, that the conveyance of the property to the Defendants rendered the value of the Debtor's stock interest in CPI worthless. The Plaintiff clarified this in his argument indicating that the fraud asserted consisted of the conveyance of the real estate from the corporation to the Defendants in violation of the Defendants' fiduciary duty.

The Defendants have suggested in their Motion for Directed Verdict that fraud can only be found where there exists a false representation or concealment of material fact, with knowledge of the falsity, or reckless disregard as to the truth, with intent to mislead another, justifiable reliance by the other, and resulting injury proximately caused by the misrepresentation and the reliance. However, the Court is not willing to take such a restrictive view of fraud. Early cases recognize that fraud is multifarious in its forms and always assuming new forms. *Watson v. Erb*, 33 Ohio St. 35, 50 (1877); *Yeoman v. Lasley*, 40 Ohio St. 190 (1883). Fraud may consist of any cunning deception or artifice used to circumvent, cheat or deceive. *Hanes v. Giambrone*, 471 N.E.2d 801, 14 Ohio App.3d 400 (1984); *Ohio v. Wisner*, 260 N.E.2d 608, 23 Ohio App.2d 1 (1970). In any case, intent or scienter is required. *Miller v. Forest City Motor Co.*, 153 N.E. 905, 23 Ohio App. 266 (1926); *Keuhner v. Johnson*, 34 N.E.2d 996, 33 O.L.A. 401 (1940).

On the other hand, the Plaintiff has asserted that the actions of the Defendants constitute fraud per se, citing O.R.C.

---

**3.** No witness for the Plaintiff spoke to the issue of the unavailability of the subject property to secure a deal during the pendency of that litigation.

§ 1701.95. This is a mischaracterization of § 1701.95, which speaks solely to the liability of shareholders who receive property while winding up the affairs or a dissolution of a corporation, without payment of all known obligations of the corporation. The statute does not state that such actions constitute fraud. Plaintiff has cited no case law for this proposition and the Court believes there is none. Furthermore, there is no evidence that the Defendants failed to make payment or adequate provision for payment of all known obligations of the corporation. In fact, the evidence would indicate otherwise.

■ Moore's Federal Practice provides an extensive analysis of motions for directed verdict. While the Court is required to take the evidence with all *reasonable* inferences, in a light most favorable to the Plaintiff, this does not require that all allegations be taken as true for purposes of the motion. Rather, the courts have held that a verdict may properly be directed when, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict. Before a motion for directed verdict can be denied, there must be sufficient amount of evidence in conflict to create a material question of fact. Substantial evidence has been defined as evidence of such quality and weight that reasonable persons in the exercise of impartial judgment may reach different conclusions. However, this requires more than a scintilla of evidence in the Plaintiff's favor. Further, a majority of the courts of appeals which have considered the issue have held that all evidence should be considered, not just that which supports the party opposing the motion for directed verdict. *See generally,* 5A Moore's Federal Practice para. 50.02[1] (2d ed.1990).

■ With these principles in mind, the Court is simply unable to deny the Motion for Directed Verdict. As to the Plaintiff's First Claim of the Complaint, there is absolutely no evidence to support the allegation that the Defendants contributed to or caused the default of the land loan with Bank One. The Bank documents are clear that the commencement of any type of bankruptcy proceeding constitutes default. Further, the Plaintiff's argument that Chapter 13 is not in actuality a bankruptcy proceeding, is wholly without merit. The remarks presented last Wednesday, September 11 by counsel for the Defendants covered this point most adequately, and need not be repeated here. The Plaintiff's oblique suggestion that the Debtor somehow had 60 days within which to "clear up" his bankruptcy and other difficulties under the terms of the Note and Mortgage is misplaced. Clearly, those provisions of the Note, Mortgage and Personal Guaranty apply only to involuntary bankruptcies.

The Plaintiff also suggests that the parties' failure to close the construction loan supports his position, since the construction loan would have been utilized to pay the land loan. However, this fact provides no assistance to the Plaintiff. The testimony of Rick Declue, the mortgage loan officer at Bank One in charge of this account, clearly indicated that the Bank was unwilling to proceed to close the construction loan under the existing circumstances. His testimony indicated that any further participation by the Debtor, either personally or as a part of the borrowing entity, was unacceptable to the Bank. Further, there is no evidence that any alternative arrangement was proposed or would have been acceptable to the Bank, other than full payment of the land loan through other means.

■ The Court is not satisfied that the Defendants acted properly if they failed to provide notice of the August and September Directors' Meetings and corporate actions. However, even assuming that the conveyance of the property without notice was improper, this alone does not constitute fraud, particularly, in this situation, where the amounts owed to the Defendants pursuant to the Mortgage, exceeded the value of the property. It appears that the Plaintiff would have the Court find fraud due to the fact that the Defendants proceeded to develop the property which resulted in some benefit to them. While it is true that surveys and some drawings had

been done, and other preparations made at the Debtor's instigation, the Defendants were unable to utilize these advantages significantly.[4] The drawings as previously described did not constitute definitive construction plans. The Debtors' suit in state court prevented the Defendants from being able to proceed expeditiously to develop the property, and in fact, they developed the property only by expending time, energy and money [5] over the course of two years. Although the Debtor purportedly had an investor in the wings to purchase the Defendant's stock and satisfy the land loan, in the person of Marvin Katz, there is no evidence that the Debtor presented any written proof or definitive proposal to the Defendant, or provided the name of this individual to the Defendant, or provided anything to the Defendants which would have provided them some sense of certainty. Further, the testimony established that Katz was not told about Debtor's bankruptcy and it is therefore unknown how that would have affected his participation in the deal.[6]

At the point when the Defendants paid Bank One and received an assignment of the Note and Mortgage, the loan was almost 60 days past due.[7] The Defendant had had almost three months within which to undertake the same remedies which the Defendants chose to undertake. In light of the amount of money at issue, precarious position of the Defendants generally, the Debtors' bankruptcy and other surrounding circumstances, the Court can reasonably infer that the Defendant felt himself in a position under which he must take action in order to preserve his investment, his credit standing, including his credibility and relationship with Bank One. Under the evidence presented by the Plaintiff, the

Court cannot find any fraudulent intent on the part of the Defendants. The Court is simply unable to find fraud in a situation where an investor protects his position, especially where the amount owed by the corporation to the Defendants exceeds the appraised value of the property, and where he undertakes all of the risks of development. Under the circumstances, taking the evidence presented by the Plaintiff in a light most favorable to the Plaintiff, the Court feels compelled to grant the Motion for Directed Verdict.

There remains the matter of the Defendants' Counterclaim in this adversary proceeding. The Counterclaim seeks judgment against the Debtors and the bankruptcy estate for amounts paid on behalf of Compton Plaza, Inc., for $2500 loaned to the Debtors by the Defendants, and for a judgment of non-dischargeability of debt based on fraud. To the extent the Counterclaim seeks a judgment against the estate, the Defendants may file a claim if they have not already done so and if the deadline has not yet expired. Pursuant to § 501 and § 502 of the Bankruptcy Code and the relevant bankruptcy rules, claims are presumed valid until objection by a party-in-interest. Therefore, it would be inappropriate to dispose of these issues at this time. To the extent that the Counterclaims seeks a judgment against the Debtors, inasmuch as these are prepetition debts, the only remedy at this time is to seek a claim against the bankruptcy estate. To the extent the Defendants' Counterclaim seeks a judgment of nondischargeability against the Debtors, the Debtors were never joined in this adversary proceeding as third-party Defendants by way of service of the Counterclaim and a Summons in accordance with Bankruptcy Rule

---

**4.** The Defendant testified that Capital City Products wanted a new concept for the building resulting in a new architect being employed. This was confirmed by Mr. Helland who testified that when he learned that the building could be customized to their needs, he then became interested in the project.

**5.** As above explained, the Defendants were unable to obtain a construction loan on this property by reason of the pending state court action

and mortgaged other properties which they owned to pay the construction costs.

**6.** Witness Richard S. Guy indicated that the Debtor's financial condition would not merit a 50–50 deal, and that the financial angel would be entitled to a higher percentage.

**7.** At the time of payment, the balance due the Bank, including interest, was $157,992.76. *See,* Defendant's Exhibit K.

7004. Further, the time for filing such a complaint expired on October 31, 1988; the Counterclaim was therefore untimely, having been filed on September 22, 1989.

A separate Final Judgment will be entered in accordance with the foregoing.

IT IS SO ORDERED.